UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| CAROLINE CROLAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO: |
| v. | ) | |
| | ) | |
| CITY OF ATLANTA and | ) | |
| | ) | |
| STEPHENSON CAMILLE, | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

COMES NOW Plaintiff Caroline Croland and brings this action against Defendants under the First, Fourth, and Fourteenth Amendments of the United States Constitution and Georgia law after she was arrested, without even arguable probable cause, for supposedly violating the City of Atlanta's disorderly conduct code by questioning an officer of the Atlanta Police Department. In fact, the officer arrested Plaintiff in retaliation for an event that occurred the week prior, when Plaintiff videotaped the officer's conduct.

### *Parties*

1.      Plaintiff Caroline Croland ("Plaintiff") is a United States citizen and

1

Georgia resident and is over the age of eighteen.

2.     Defendant Officer Stephenson Camille  ("Camille") is employed as

police officer by the City of Atlanta.  He is sued in his individual

capacity.  At all times relevant to the complaint, he acted under the

color of law.

3.     Defendant City of Atlanta is a municipal corporation created under the

laws of the State of Georgia.  At all times relevant to this complaint,

the City of Atlanta employed Officer Camille as a police officer with

the Atlanta Police Department ("APD").  Defendant City of Atlanta

was a moving force of Plaintiff's arrest due to a series of

unconstitutional policies and practices.

*Jurisdiction and Venue*

4.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331

because this case presents a federal question under 42 U.S.C. § 1983

and the First, Fourth, and Fourteenth Amendments of the United

States Constitution.

5.     This Court has supplemental jurisdiction over Plaintiff's state law

claims under 28 U.S.C. § 1367.

2

6.      Upon service of process, this Court acquires personal jurisdiction of
the Defendants under Fed.R.Civ.P. 4(k)(1)(a).

7.      Venue is proper in the Northern District of Georgia under 28 U.S.C. §
1391(b) because all actions complained of herein occurred within the
boundaries of this district and Defendants reside within this district.

## STATEMENT OF FACTS

8.      Caroline Croland is a dedicated activist and volunteer.  She is a long-
standing core member of the group Food Not Bombs.

9.      Part of Food Not Bombs' mission is to serve homeless people by
regularly preparing and distributing meals to them.  As a Food Not
Bombs volunteer, Croland prepared and distributed meals to homeless
men and women in Woodruff Park most Sunday afternoons.

10.     Croland is an also an active member of Cop Watch of East Atlanta
("Cop Watch"), a watch-dog group focused on increasing police
accountability and preventing police brutality by filming police
officers in public.

11.     Croland often commits more than 20 hours a week to volunteering for
Food Not Bombs and Cop Watch.

<u>Plaintiff's Prior Incident Filming Officer</u>

12.     Croland and other Cop Watch volunteers filmed Officer Camille in

        Woodruff Park on May 25th, 2014 as Camille and several other APD

        officers detained and searched three unknown African-American men

        for no apparent reason.  The APD officers detained and searched the

        men without explaining to them why they were being stopped.

13.     Croland filmed Officer Camille as she and other Cop Watch

        volunteers observed Camille detain and search one of the three men.

14.     Officer Camille was aware that Croland and the other volunteers were

        filming him as he detained and searched the three men.

15.     Upset by the filming, Officer Camille told the potential arrestees to

        "not listen to the [the Cop Watch volunteers]" and that the Cop Watch

        volunteers were "just a bunch of leeches trying to game the system."

16.     After finding nothing incriminating on the three men, and being

        monitored by Croland and others, Camille and the other APD officers

        released the group without arrest.

17.     Croland and other Cop Watch volunteers then followed Camille to ask

        for his identifying information.  Camille took exception to the

4

questions regarding his identity and conduct and became increasingly

confrontational to Croland and her colleagues.  Camille was the only

APD officer who went out of his way to confront the Cop Watch

volunteers that day.

<u>Croland's Arrest for Questioning Officer Camille</u>

18.    One week later, on June 1, 2014, Officer Camille returned to

Woodruff Park where Food Not Bombs volunteers where distributing

meals to the homeless.

19.    After he arrived, Camille inexplicably surveilled the Food Not Bombs

volunteers—*for an hour and a half*—relentlessly hovering over them

and scrutinizing their every move.  During that entire time, Camille

stationed himself at or near the Woodruff Park pavilion, in the direct

vicinity of a table that the volunteers had set up to assemble and

distribute meals.  As he surveilled the volunteers, Camille repeatedly

took a list of park rules out of his pocket, studied it, and then returned

it to his pocket.

20.    Camille insisted on staying in the park to retaliate against the

volunteers.  Volunteers noted to Officer Camille that there was no

apparent reason for him to hover around them in the park and that he was making those gathered for the meal feel "nervous" and "unsafe." Without explaining his continued surveillance, Camille curtly responded that he "chose not to" leave because he was in a "public park" and he would "rather stay." At one point, Camille even idly played a game called Candy Crush on his phone rather than patrolling elsewhere.

21.     Throughout this entire period, several park ambassadors were in Woodruff Park and raised no concerns about the volunteers' actions or any other activities in the park.

22.     At no point prior to or during Officer Camille's surveillance and intimidation campaign did he receive any complaints about Croland, the Food Not Bombs volunteers, nor the Cop Watch volunteers in Woodruff Park.

23.     The volunteers' actions that day were consistent with their previous actions of feeding the homeless in the park. They simply arrived in the afternoon, prepared meals, and handed those meals out. If they saw someone stopped or arrested, they filmed the incident, as was

their practice.

24.     After surveilling the volunteers without cause for well over an hour, Camille focused on Croland.  He moved directly adjacent to the Food Not Bombs table where Croland was passing out food.  As he came closer, Croland expressed out loud that she felt threatened by Camille's unwarranted hovering.

25.     Officer Camille refused to move away from the Food Not Bombs table despite Croland's expressed concerns.

26.     Croland rhetorically asked another volunteer why she could not share a meal in the park without being harassed by the police.  She then asked Officer Camille, "Why?"  Croland said, "Answer me!" Officer Camille was about twenty feet away at the time.

27.     Without arguable probable cause for any criminal conduct, Camille then approached and arrested Croland immediately after she said, "Answer me."  He did not issue a warning or provide any further explanation.  Camille charged Croland with disorderly conduct for causing, provoking, or engaging a fight or riot under the City of

Atlanta's municipal code.[1]

28.     Immediately prior to, during, and after the arrest, the people in the park were casually playing drums, talking, and waiting on a Sunday meal.

29.     At no point before or after Croland's arrest was she—or anyone else in Woodruff Park—engaged in or escalating towards conduct what could be considered a fight, brawl, or riot.

30.     At no point before, during, or after being arrested did Croland request or encourage anyone gathered in the park to take any action whatsoever.

31.     After Camille arrested Croland, and as evidence of his retaliatory motivation, he included special instructions in her processing documents that she not be allowed to post bail before appearing in court.  Based on the facts Camille knew at the time, there was absolutely no reason for him to include these instructions in Croland's arrest and processing documents.

---

[1]  "It shall be unlawful for any person within the corporate limits of the city to … cause, provoke or engage in any fight, brawl or riotous conduct so as to endanger the life, limb, health or property of another."  Atlanta, GA., Ordinances ch. 106, art. III, § 106-81(3) (2007).

32.     As a result of these instructions, Croland was processed into the Atlanta City Detention Center ("ACDC") where she was made to change into an ACDC uniform and placed in an isolation cell over night.

33.     Unable to post bail and as a result of Camille's instructions, Croland was subjected to ACDC staff members indifferent to her diagnosed mental health needs, which caused her to have an "extreme" panic attack.  Prior to being placed in isolation, she explained that she had an anxiety disorder and that placing her in isolation would likely trigger an anxiety attack.  ACDC staff nevertheless placed her in isolation despite her pleas.

34.     The conditions of the isolation cell were deplorable.  The bed was covered with urine.  Croland repeatedly tried to call for assistance through the electronic intercom system.  She told a guard that she was having difficulty breathing to which the guard explained, "[there] is plenty of air in there."  Croland remained panicked all night because of the screams of other detainees and because unidentified ACDC staff members randomly turned the lights in her cell off and on and

shined their flashlights into her room.

35.     After pleading for assistance for hours, an unidentified ACDC staff member informed Croland that she was in isolation because she was one of the "trouble makers."  On information and belief, that designation arose from information provided by Defendants.

36.     Croland was finally released on a signature bond the next morning after spending more than 20 hours in ACDC.

37.     The City of Atlanta's solicitor refused to pursue the charge further and City of Atlanta Municipal Court dismissed the charge on September 24, 2014.

38.     Officer Camille's actions were without arguable probable cause, in retaliation for his interaction with Croland the previous week and intended to interfere with her right to film police.  He referred to her as a "leech" and described her constitutionally protected actions as, "gaming the system."  Without explanation or need, he returned to Woodruff Park on a day when he knew Croland and other volunteers would regularly be there.  He scrutinized their every move for an hour and a half, looking for something that he could construe as a violation

of park rules.  He then arrested Croland, referred to her as a "trouble maker," and intentionally subjected her to a anxiety ridden night in detention for a charge he knew, or should have known, was patently false and lacking in even arguable probable cause.

39.     As a result of the Officer Camille's actions, Plaintiff suffered loss of liberty, humiliation, and both physical and emotional distress.  Prior to the arrest, she was managing her anxiety without medication. Afterward, Croland was forced to go back into therapy.  She now suffers from generalized anxiety and paranoia resulting in a dramatic increase in panic attacks, which have gotten progressively more severe.  Her anxiety levels inhibit her ability to concentrate and her panic attacks cause her to experience shortness of breath, to pace, to feel trapped, and occasionally, to have periods of disrealisation.  Her anxiety kept her from returning to Woodruff Park for a month.  After finally returning, she no longer feels that Food Not Bombs is a "safe space," as she did before.

**City of Atlanta's Policy and Practice and Contempt of Court in Failing to Adopt Court Required Policies and Training**

40.     The City of Atlanta, as a matter of policy and practice, has routinely and customarily interfered with and often arrested citizens for constitutionally protected filming or photographing of police activity.

41.     At least three legal matters have been settled by the City of Atlanta involving APD officers who interfered with and arrested citizens solely for constitutionally protected filming or photographing of police activity.  Several other instances, not leading to litigation, have occurred where officers interfered with and arrested citizens solely for constitutionally protected filming or photographing of police activity.

42.     In *Anderson v. City of Atlanta,* No. 11-CV-3398-SCJ (N.D. Ga. 2011), Plaintiff, Felicia Anderson, brought a case against the City of Atlanta and one of its police officers alleging, among other things, that she was falsely arrested for photographing public police activity pursuant to an unlawful policy and practice of the APD.

43.     The parties ultimately reached a settlement on Ms. Anderson's claims that included a Consent Order requiring the City to: (A) add specific language to the Atlanta Police Department's Standard Operating Procedure ("SOP") prohibiting officers from deleting or destroying

recordings of police activity; (B) upgrade the penalty for officers who interfere with the public's right to record to a dismissal category offense; and (C) train officers every two years on these new changes to the SOP.  The Order required that the City of Atlanta "permanently … implement" specific revisions to the APD SOP and "to conduct mandatory in-person training of all Atlanta police officers every two years regarding these SOP revisions."

44.     The City of Atlanta violated the Order in *Anderson and was held in Contempt of Court by the District Court in that action.* (Contempt Order attached hereto as Exhibit A; Original Consent Order Attached hereto as Exhibit B).

45.     Further, in *Calhoun v. City of Atlanta*, No. 1:09-CV-3286-TCB (N.D. Ga. 2011), the City of Atlanta entered into a Consent Order whereby the City agreed to permanently revoke or amend all APD SOPs regarding warrantless searches, arrests, and investigatory detentions and frisks without reasonable articulable suspicion.  The *Calhoun* Order also required officers to have identification visible to citizens. As part of that order, the City agreed to "prohibit Atlanta police

officers from interfering in any way with a citizen's right to make video, audio, or photographic recordings of police activity, as long as such recording does not physically interfere with the performance of an officer's duty."  (Consent Order Attached hereto as Exhibit C).

46.  The *Calhoun* Order required that the City of Atlanta conduct mandatory, in-person trainings by non-APD trainers for all sworn APD employees.  This included training about officers being prohibited from interfering with citizens' right to record police activity.  The Order required that the City of Atlanta provide recurring training on this issue to every sworn APD officer every two years.

47.  Despite these orders, APD did not add all the court-ordered language regarding citizen recordings to its SOP and failed to conduct any training on this topic until June 2015.

48.  Well over two years later, and in deliberate indifference to the straightforward requirements of ***both*** consent orders, the City still had not complied.  At the time of Croland's arrest, the language of Section 4.4.1 of APD.SOP.2011 was identical to what it was when the Court ordered that it be revised.  In addition, the City still had not conducted

14

the trainings that it was ordered to conduct in either the *Anderson*

Order or the *Calhoun* Order.

49.     The City's failures resulted in actual harm, beyond Croland's arrest.  In

November 2014, several reporters covering the Ferguson

demonstrations in downtown Atlanta had their cameras taken away

from them by APD officers as they attempted to film police activity.

One of them was Tyson Paul, a photojournalist for 11Alive News,

whose arrest by police officers during his coverage of the protests has

been the subject of numerous news stories.

50.     The City of Atlanta was held in contempt of court for its repeated

failure to adopt policies and trainings required by existing Court

orders dealing specifically with not interfering with citizens'

photographing or filming of police activities.  (Contempt Order

attached hereto as Exhibit A).

51.     The City of Atlanta's deliberate indifference to the need for policies

and training, made patently clear by the consent orders it entered into

and then violated for years, was a moving force for the constitutional

violations suffered by Croland.  Moreover, the City's on-going refusal

to comply with the consent orders created a *de facto* custom of APD officers repeatedly interfering with—and often arresting—citizens who are legally photographing or filming police activity.

## Count I: Fourth Amendment

52.     This Count is alleged against Officer Camille, in his individual capacity, and the City of Atlanta, under 42 U.S.C. § 1983 and the Fourth Amendment of the United States Constitution for unlawful seizure, false arrest, and malicious prosecution.

53.     Officer Camille returned to Woodruff Park on June 1, 2014 for the purpose of retaliating against the Cop Watch volunteers because of their filming activities the week before.

54.     At the time that he arrested Croland, Officer Camille did not have probable cause—or arguable probable cause—to believe that Croland committed the crime of disorderly conduct or any other criminal offense.

55.      At the time he arrested Croland, neither did Officer Camille have any knowledge of any of the facts needed to establish probable cause that

16

Croland committed the crime of disorderly conduct or any other criminal offense.

56.    Based upon the facts known by Camille at the time that he arrested Croland, no reasonable police officer could believe that there was even arguable probable cause to arrest her under Atlanta's disorderly conduct ordinance.

57.    Camille's arrest of Croland was a pretext for retaliating against the Cop Watch and Food Not Bombs volunteers for their constitutionally protected free speech activities.

58.    Officer Camille acted with conscious indifference and reckless disregard for the consequences of his actions such that an award of punitive damages is authorized under federal law.

59.    Officer Camille's actions were caused in part by the policy and practice of the City of Atlanta whose failure to adopt Court ordered policies and trainings was a moving force for the harms caused.


## Count II: First Amendment

60.    This Count is alleged against Officer Camille and the City of Atlanta

17

under 42 U.S.C. § 1983 and the First Amendment of the United States Constitution.

61.     Croland was engaged in clearly constitutionally protected free speech activity at all times prior to being arrested on June 1, 2014.

62.     Officer Camille's unwarranted hour-and-a-half-long surveillance of Croland impeded her constitutionally protected rights to assembly and free speech.

63.     Croland's statements of "Why" and "Answer me"—made twenty feet away from Officer Camille as he was not engaged in any police encounter whatsoever—were protected speech.

64.     The actions of the officers were caused in part by the policy and practice of the City of Atlanta's failure to adopt Court ordered policies and trainings and was a moving force for the harms caused.

## Count III: Individual State Law Claims

65.     This Count is alleged against Officer Camille in his individual capacity.

66.     By placing Croland under arrest and instituting prosecution,

18

Defendant Camille violated his public duty when he assaulted and battered Croland in violation of O.C.G.A. §§ 51-1-1, 51-1-13, and 51-1-14; falsely arrested Croland in violation O.C.G.A. § 51-7-1; falsely imprisoned her in violation of O.C.G.A. §§ 51-7-20 and 51-7-22; and maliciously prosecuted her in violation of O.C.G.A. § 51-7-40.

67.     As the facts alleged indicate, the Officer Camille acted with actual malice toward Croland.  In making the decision to arrest her, Officer Camille possessed the deliberate intent to do wrong.

68.     Officer Camille's actions were retaliatory, malicious, reckless, and callously indifferent to Croland's clearly established rights, and he is not entitled to official immunity under Georgia law.

### Prayer for Relief

WHEREFORE, Plaintiff requests this Court:

a.      Hold a trial by jury on all issues so triable;

b.      Award nominal, compensatory and punitive damages against the officers in their individual capacities and nominal and compensatory damages against the City of Atlanta in an amount to be proven at trial;

19

c.      Award compensatory damages against the City of Atlanta under the doctrine of respondeat superior for state law claims in an amount to be proven at trial;

d.      Award Plaintiff attorney's fees under 42 U.S.C. § 1988 and as authorized under Georgia law;

e.      Grant such other and further relief as this Court deems just and proper.

Respectfully submitted, this **September 21**, 2015.

/s/ Gerald Weber
Georgia Bar No. 744878
Law Offices of Gerry Weber, LLC
Post Office Box 5391
Atlanta, GA 31107
(404) 522-0507

/s/ Daniel J. Grossman
Georgia Bar No. 313815
Law Office of Daniel J. Grossman
1579 Monroe Drive, Ste. F-138
Atlanta, GA 30324
(404) 654-0326

/s/ G. Brian Spears
Georgia Bar No. 670122
Law Offices of G. Brian Spears, PC
1126 Ponce de Leon Avenue
Atlanta, Georgia 30306
(404) 872-7086

Attorneys for Plaintiff-Croland